U.S. DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------------------------------X   Case No.   20-cv-9563
MERLENE DAYAN and ESTATE OF RAYMOND
DAYAN,

        Plaintiffs,

v.

LEONORA SUTTON, ESTATE OF MAYER SUTTON,   COMPLAINT
ISAAC SUTTON, ALBERT SUTTON, MORRIS
SUTTON, ELIAS SUTTON a/k/a ELLIOT SUTTON,
MIDDLEGATE SECURITIES LTD. and ABC
Co., Inc. 1-10,

        Defendants.
-----------------------------------------------------------------X

      Plaintiffs, by their undersigned counsel, Gabriel Fischbarg, Esq., as and for their complaint against defendants Leonora Sutton, Estate of Mayer Sutton, Isaac Sutton, Albert Sutton, Morris Sutton, Elias Sutton a/k/a Elliot Sutton, Middlegate Securities, Ltd. and ABC Co., Inc. 1-10 allege as follows:

## INTRODUCTION

    1.    This action concerns Defendants' wrongful conduct arising from the plaintiffs' entrusting of over $1.6 million to New York-based financial advisors of which at least $732,952 were looted by the persons and/or entities to whom they were entrusted.

## THE PARTIES

    2.    Plaintiff Estate of Raymond Dayan is, and at all times mentioned in this Complaint was, an estate domiciled and existing in the State of New Jersey.  Raymond Dayan ("Raymond") died November 20, 2016. Jonathan Dayan ("Jonathan") and Morris Dayan ("Morris D.") are Raymond's sons and were appointed to serve as the Co-Executors of Raymond's Estate by the Surrogate's Office of Monmouth County, New Jersey in May, 2019 and

1

continue to act in such capacity. Hereinafter Raymond and Raymond's Estate shall be referred to as "Raymond".

3. Plaintiff Merlene Dayan is, and at all times mentioned in this Complaint was, an individual domiciled and existing in the State of New Jersey and is the surviving spouse of Raymond Dayan.

4. Defendant Leonora Sutton ("Leonora") a/k/a Nora Sutton is the Administrator of the Estate of Mayer Sutton ("Mayer"), who died on June 21, 2016. Leonora is the surviving spouse of Mayer. Leonora was appointed to serve as such Administrator by Decree of the Surrogate's Court of Kings County dated July 2, 2018 and continues to act in such capacity. At all times mentioned in this Complaint, Mayer's Estate is and was, an estate domiciled and existing in the State of New York.

5. At all relevant times, defendants Isaac Sutton ("Isaac") Albert Sutton ("Albert"), Morris Sutton ("Morris"), and Elias Sutton a/k/a Elliot Sutton ("Elliot") each reside in the Flatbush neighborhood of Brooklyn, New York and each is a member of the same Sephardic Jewish community as Merlene Dayan and the deceased Raymond Dayan. At all relevant times until his death in 2016, Mayer did reside in the Flatbush neighborhood of Brooklyn, New York, and was a member of the same Sephardic Jewish community as plaintiff Merlene Dayan and the deceased Raymond Dayan. Those connections allowed the Suttons to gain the trust of the Dayans in order to obtain control over the Funds to use for their own benefit beginning sometime in 2018 or before.

6. Upon information and belief, defendant Middlegate Securities Ltd. ("Middlegate") is the broker-dealer through which the Suttons operated and, upon information and belief, founded. Middlegate is a New York corporation and Financial Industry Regulatory

Authority (FINRA) registered broker-dealer with its principal place of business in New York, New York. Between January 1992 and June 2010, Isaac Sutton's individual FINRA broker's license was registered at Middlegate.

7. Elliot Sutton's individual FINRA broker's license has been registered at Middlegate from 1989 until the present. He owns between 25% and 50% of the company.

8. Albert Sutton's individual FINRA broker's license has been registered at Middlegate from 1988 until the present. He is currently Executive VP, Secretary and Director of the company. He owns between 10% and 25% of the company.

9. At all times relevant to this action, Mayer was a banker engaged in the business of consulting about, managing and/or investing money owned by members of the same specific Sephardic Jewish community located in both Brooklyn, New York, and the Deal, New Jersey area including Merlene Dayan and Raymond, and maintained or held or on behalf of such community members in accounts located in the U.S. and in foreign countries.

10. At all times relevant to this action, upon information and belief, through the "Sutton Entities" defined below, Isaac, Morris, Albert and Elliot also engaged in the business of consulting about, managing and/or investing money owned by members of the same Sephardic Jewish community of Brooklyn, New York and the Deal, New Jersey area, including Merlene Dayan and Raymond, and maintained or held or on behalf of such community in accounts located in the U.S. and in foreign countries.

11. At all times relevant to this action, Isaac was a licensed stock broker and life insurance broker.

12. In addition to the foregoing, upon information and belief, Isaac, Morris, Elliot, Albert are each a former or current owner of family owned entities, to wit: Middlegate

Securities, Ltd., Middlegate Asset Management LLC, Middlegate Commodities, LLC, Middlegate Factors LLC, Middlegate Funding LLC, Middlegate HCV 6 LLC, Middlegate Investment Company, Middlegate Ventures, LLC (collectively, the "Middlegate Entities").

13. Upon information and belief, the Middlegate Entities are alter egos of one another.

14. During the relevant time period, Isaac, Elliot, Albert and Morris each held himself out as an investment advisor and agent of the Middlegate Entities.

15. Upon information and belief, Isaac has significant experience with managing money and investments abroad, as a stockbroker and investment advisor.

16. Upon information and belief, Morris has significant experience with managing money and investments abroad, as an unregistered investment advisor.

17. Upon information and belief, Albert has significant experience with managing money and investments abroad, as a stockbroker and investment advisor.

18. Upon information and belief, Elliot has significant experience with managing money and investments abroad, as a stockbroker and investment advisor.

19. During his lifetime, Mayer was a banker and had significant experience with managing money and investments abroad as an investment advisor.

20. The Suttons have attempted to conceal their wrongdoing by operating through a bewildering number of companies sponsored by them, including without limitation, the Middlegate Entities. Plaintiffs have endeavored to identify, and name as defendants, those companies that are directly related to the events giving rise to this action. However, Plaintiffs do not concede that the numerous entities created by the Suttons in furtherance of their fraudulent activities are actually different companies. Accordingly, the allegations set forth herein against

the Suttons and the entities they own and control should be imputed to the entire enterprise and its agents referred to collectively herein as the "Sutton Defendants." Plaintiffs reserve their rights to amend their complaint to add, rename or remove defendants including the ten "John Doe" companies called defendants ABC Co., Inc. 1-10 based upon culpable or complicit parties identified in discovery.

21. Upon information and belief, defendants and each of them were the agents, employees, partners, joint-venturers, co-conspirators, owners, principals, shareholders, members, officers, directors and/or employers of the remaining defendants, and each of them and are and at all times herein mentioned were, acting within the course and scope of that agency, employment, partnership, conspiracy, ownership, membership or joint venture, and that the acts and conduct herein alleged of each such defendant were known to, authorized by and/or ratified by the other defendants, and each of them.

## JURIDICTION AND VENUE

22. Personal jurisdiction over the Defendants is based upon 28 U.S.C. § 1332(a)(1) because Plaintiffs are both citizens of New Jersey, and the Defendants are all citizen of the State of New York, and the matter in controversy exceeds the sum or value of $75,000.00, exclusive of costs and interests.

23. Venue is proper in the Southern District of New York pursuant to 28 US.C. §1391(b)(2) being that a substantial part of the events or omissions giving rise to the claims occurred in the Southern District of New York.

## INVESTMENT BY PLAINTIFFS WITH DEFENDANTS

24. Third Party Atlas Capital SA ("Atlas") was a Geneva, Switzerland based private

wealth management firm founded in or around 1984 by the Dwek family. The Dweks and the Suttons are cousins.

25. In 2013, Atlas merged with Mirelis Holding SA (formerly called Mirelis InvesTrust SA), another Geneva, Switzerland based financial institution, which does business in the United States and Switzerland via Mirelis Advisors SA, a foreign registered investment adviser with the U.S. Securities and Exchange Commission (SEC) ("Mirelis"). The Dweks continue to own Mirelis and are involved in its operations. In 2014, Mirelis acquired Hyposwiss Private Bank Genève SA ("Hyposwiss"). Plaintiffs understand that both Hyposwiss and Mirelis (which are organized as a single enterprise, 100% owned by Mirelis Holding SA) carry on Atlas's pre-merger business activities. As used herein, "Atlas" shall refer to both the pre-merger Atlas and post-merger Mirelis and Hyposwiss companies.

26. In approximately 2006, the defendants agreed to manage approximately $1,695,908 co-owned by Raymond Dayan and Merlene Dayan as marital assets in a conservative manner, the primary objective being capital preservation given that the Dayans were elderly retirees. In 2006, Raymond was 80 years old and Merlene was 71 years old. It was also agreed by the parties that any investments made by defendants of plaintiffs' funds would be liquid or would be able to be liquidated within a reasonable time. In return for the defendants' management of plaintiffs' funds as set forth above, the parties agreed that defendants were entitled to charge a reasonable fee. Upon information and belief, in approximately August, 2006, the defendants deposited assets and securities such as stocks and bonds worth $1,508,523 owned by the plaintiffs into 3 separate accounts at Atlas. On or about August 10, 2006, plaintiffs deposited an additional $180,000 into one of the 3 Atlas accounts. On or about November 1, 2006, plaintiffs deposited an additional $187,285 into the same Atlas account. As a result of such deposits, defendants received a total of

approximately $1,695,908 owned by plaintiffs to manage. Such funds were the sole assets of the Dayans besides their condo apartment in Long Branch, New Jersey and constituted their life savings.

27. Plaintiffs periodically requested and received from the defendants various separate withdrawals of plaintiffs' funds from 2006 to 2012 totaling $605,105 in order to pay for the ongoing living expenses of the Dayans.

28. In approximately July, 2016, plaintiffs, through their son Morris D., requested the full and orderly liquidation of any investments made with the plaintiffs' funds and the repayment of all plaintiff's funds managed by the defendants. The request for full withdrawal was made due to (1) Raymond Dayan's rapidly deteriorating health and his increasing health expenses and (2) Merlene Dayan's need to plan her independence given the looming passing of her ailing husband.

29. In response to such request, defendants made 4 check repayments of $100,000 on August 29, 2016, $120,000 on September 22, 2016, $50,000 on March 29, 2017 and $50,000 on August 2, 2017.

30. As mentioned above, Raymond Dayan died in June, 2016, before any of the 4 check repayments occurred.

31. After deduction of such repayments and $37,851 for fees charged by defendants, plaintiffs calculated that at least $732,952 of the initial principal investment was still due to be returned by defendants as of August 3, 2017. This amount constitutes only the amount actually invested with the defendants and does not include any gain that should have resulted from a conservative investment strategy implemented from 2006 to 2017 applicable to typical retirement savings. For example, from August 1, 2006 to August 1, 2017, the Dow Jones Industrial Index went from 11,391 to 21,950, an increase of approximately 92.7 % or approximately 8.42% per year.

32. After Morris D. made a text request in December, 2017 for a status of the repayments due by defendants, defendant Morris Sutton responded by text in February, 2018 that no additional funds were available for repayment. Morris Sutton did not explain in that text or anytime afterwards what had happened to the remainder of the plaintiffs' funds managed by the defendants.

33. Defendants have refused to return any more money to the plaintiffs. Defendants have refused to inform plaintiffs as to what happened to remainder of plaintiffs' funds managed by defendants. Defendants have refused to communicate with or meet with plaintiffs or their representatives despite multiple requests for information by plaintiffs. Defendants have refused to provide any account statements concerning plaintiff's money. As a result of such obstreperous conduct, plaintiffs have had to hire investigators to conduct a costly financial investigation to ascertain any and all information regarding the money that was entrusted to the defendants. Plaintiffs only learned of the existence of the Atlas accounts after the investigators were able to locate them in 2019. Because defendants never provided any account statements to plaintiffs, plaintiff never had any knowledge as to the whereabouts or uses of plaintiffs' funds by defendants until the investigators obtained some partial account statements from Atlas.

34. A review of statements discovered and provided to plaintiffs by Atlas in approximately March, 2019 after plaintiffs' investigators requested that Atlas provide such information directly to plaintiffs indicates that (1) one account containing approximately $617,246 of plaintiffs' money was closed in 2013 and that unknown recipients received the $617,246 on February 21, 2013 that was in the account, (2) a withdrawal of $150,026 occurred on November 11, 2010 from that account and sent to unknown recipients and (3) another account containing $262,630 USD (200,000 EURO) of plaintiffs' money was closed in 2014 and that unknown recipients received the $262,630 on January 4, 2013 that was in the account. Plaintiffs have been unable to

8

determine what happened to that money totaling $1,029,902 after those distributions to unknown parties in 2010 and 2013.

35. Thus, in breach of the agreement that plaintiffs' funds would be managed professionally and conservatively, the defendants have instead looted the money held in the accounts at Atlas under defendants' custody and control and have converted the funds for their sole use and benefit.

36. The defendants have not denied any wrongdoing or involvement in the theft of plaintiffs' funds. Defendants have also obstructed plaintiffs' investigation of what occurred by refusing to provide any information concerning the plaintiffs' funds, including, without limitation, any and all transactions and investments wrongfully funded with plaintiffs' money and without the plaintiffs' knowledge or consent.

37. Defendants have never denied having control of or managing plaintiffs' money. Rather, defendants have declared that repayment was ceasing as of February 23, 2018 only because, as Morris Sutton wrote in a text on February 23, 2018, "I'm literally borrowing money from my friends to pay my bills until my apt (sic) is sold."

38. Upon information and belief, Morris Sutton actually did sell his apartment referred to in his February 23, 2018 text for $3,395,000 on May 23, 2019. Plaintiffs never received any money from the proceeds of Morris Sutton's apartment sale.

## AS AND FOR A FIRST CAUSE OF ACTION
(Breach of Contract)

39. Plaintiffs entered an agreement with defendants pursuant to which defendants agreed to manage the plaintiffs' funds for the benefit of plaintiffs.

40. The Suttons, who at all relevant times hereto operated through Middlegate Entities and held themselves out to be acting as the principals of the Middlegate Entities, agreed to manage and safekeep the plaintiffs' funds for the benefit of plaintiffs.

41. The defendants breach the agreement by (1) using plaintiffs' funds for their own benefit instead of plaintiffs' benefit, (2) failing to manage the plaintiffs' funds in the manner agreed upon by the parties, and (3) failing to exercise oversight over the accounts holding plaintiffs' funds in the plaintiffs' best interests.

42. Defendants' breach of agreement with plaintiffs directly caused plaintiff to suffer losses in an amount that is no event less than $732,952, subject to full accounting and trial, plus consequential damages arising from such breaches, attorneys' fee, investigation fees, a reasonable rate of return on plaintiffs' invested funds from the date of investment, prejudgment interest and punitive damages.

AS AND FOR A SECOND CAUSE OF ACTION<br>(Breach of Fiduciary Duty)

43. Plaintiffs reallege and repeat each and every allegation set forth above as if fully set forth again herein.

44. The Suttons and Middlegate were the financial advisors of defendant Merlene Dayan and Raymond Dayan with discretionary authority over the plaintiffs' funds subject to the requirement that the funds be invested conservatively in liquid investments or in investments that could be liquidated within a reasonable time.

45. In reliance upon the Suttons' and Middlegate's superior financial knowledge, defendant Merlene Dayan and Raymond Dayan entrusted management of all their liquid assets and life savings to those parties.

46. The Suttons and Middlegate therefore owed fiduciary duties of good faith and loyalty to defendant Merlene Dayan and Raymond Dayan.

47. The Suttons and Middlegate caused plaintiffs' funds to be transferred to unknown parties and/or to parties controlled by, owned by or reporting to the Suttons and/or Middlegate.

48. Defendants breached their duties by failing to act in plaintiffs' interests, and instead made use of plaintiffs' funds in furtherance of their own personal interests and gain.

49. Defendants further breach their duties to plaintiffs by failing to provide plaintiffs with complete information concerning accounts containing investments made with plaintiffs' funds and the uses of plaintiffs' funds.

50. Defendants' breaches of duty caused the plaintiffs to be deprived of their funds and main source of their living expenses.

51. Defendants' breach of agreement with plaintiffs directly caused plaintiff to suffer losses in an amount that is in no event less than $732,952, subject to full accounting and trial, plus consequential damages arising from such breaches, attorneys' fee, investigation fees, a reasonable rate of return on plaintiffs' invested funds from the date of investment, prejudgment interest and punitive damages.

AS AND FOR A THIRD CAUSE OF ACTION<br>(Unjust Enrichment)

52. Plaintiffs reallege and repeat each and every allegation set forth above as if fully set forth again herein.

53. Plaintiffs were induced by the Suttons and Middlegate to entrust plaintiffs' funds to them.

54. The Suttons and Middlegate caused plaintiffs' funds to be be transferred to unknown parties and/or to parties controlled by, owned by, or reporting to the Suttons and/or Middlegate.

55. Rather than manage the plaintiffs' funds in plaintiffs' best interests and for plaintiffs' exclusive benefit, the funds were used for defendants' benefit.

56. Accordingly, defendants were enriched at the expense of plaintiffs, the rightful owners of the funds.

57. Defendants breached their duties in making use of the plaintiffs' funds in a manner contrary to plaintiffs' interests.

58. Under such circumstances, it is against equity and good conscience to permit defendants to retain the benefit received as a result of their wrongful conduct, and plaintiffs are entitled to recoup the benefits received by defendants as a result of their wrongdoing, in an amount that is no event less than $732,952 , subject to full accounting and trial, plus attorneys' fee, investigation fees, a reasonable rate of return on plaintiffs' invested funds from the date of investment, prejudgment interest and punitive damages.

AS AND FOR A FOURTH CAUSE OF ACTION
(Money Had and Received)

59. Plaintiffs reallege and repeat each and every allegation set forth above as if fully set forth again herein.

60. The funds given by plaintiffs to defendants to manage belong to plaintiffs.

61. Defendants either directly or indirectly received money and/or improper fees from the accounts that defendants created to manage plaintiffs' funds.

62. Plaintiffs never authorized defendants to receive that money.

63. The defendants' recipients of plaintiffs' money benefitted from the use and possession of that money.

64. Defendants should not in equity and good conscience be permitted to retain plaintiffs' money that was wrongfully transferred, used on the behalf of defendants or others, and/or paid to defendants.

65. Defendants should therefore be disgorged of all money belonging to plaintiffs that was had or received, in no event less than $732,952, subject to full accounting and trial, plus attorneys' fee, investigation fees, a reasonable rate of return on plaintiffs' invested funds from the date of investment, prejudgment interest and punitive damages.

AS AND FOR A FIFTH CAUSE OF ACTION
(Conversion)

66. Plaintiffs reallege and repeat each and every allegation set forth above as if fully set forth again herein.

67. Plaintiffs had a right to possession of the assets within the accounts utilized by defendants to manage plaintiffs' funds.

68. Defendants took possession of the accounts and accounts' funds for their own use and enjoyment.

69. The defendants' use of the accounts and the funds therein excluded the plaintiffs from making use of the accounts or benefitting from them.

70. The defendants' conversion of the accounts and the funds therein for their own benefit to the exclusion of plaintiffs damaged the plaintiffs in an amount in that is no event less than $732,952 , subject to full accounting and trial, plus consequential damages arising from such conversion, attorneys' fee, investigation fees, a reasonable rate of return on plaintiffs' invested funds from the date of investment, prejudgment interest and punitive damages.

## AS AND FOR A SIXTH CAUSE OF ACTION
(Accounting)

71. Plaintiffs reallege and repeat each and every allegation set forth above as if fully set forth again herein.

72. Defendants received plaintiffs' funds.

73. Defendants owed plaintiffs fiduciary duties with respect to plaintiffs' funds.

74. Plaintiffs relied upon the defendants to manage and oversee the plaintiffs' funds and life savings.

75. Defendants have failed to account fully for the uses of the plaintiffs' funds.

76. Defendants should therefore be required to account to plaintiffs for all of the plaintiffs' funds.

JURY DEMAND

77. Plaintiffs demand a trial by jury on all issues.

WHEREFORE, judgment is demanded in favor of Plaintiffs against Defendants on each cause of action in an amount to be determined by the Court including compensatory damages in an amount to be proven at trial but that are at least more than $732,952, consequential damages, investigation fees, a reasonable rate of return on plaintiffs' invested funds from the date of investment, pre- and post-judgment interest, punitive damages, attorneys' fees, costs and other relief as this Court may deem appropriate.

Dated:  November 13, 2020  
New York, NY

By:_____/s/_____  
Gabriel Fischbarg, Esq.  
230 Park Avenue, Suite 904  
New York, New York 10169  
(917) 514-6261  
Attorney for plaintiffs