U.S. DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
---------------------------------------------------------------X Civil Action No. 20-cv-9563
MERLENE DAYAN and ESTATE OF RAYMOND DAYAN,

Plaintiffs,

v.

LEONORA SUTTON a/k/a LENORA SUTTON, ESTATE OF MAYER SUTTON, ISAAC SUTTON, ALBERT SUTTON, MORRIS SUTTON, and ELIAS SUTTON a/k/a ELLIOT SUTTON, and ABC Co., Inc. 1-10,

Defendants.
---------------------------------------------------------------X

# FOURTH AMENDED COMPLAINT

Plaintiffs, by their undersigned counsel, Gabriel Fischbarg, Esq., as and for their Fourth Amended Complaint against defendants Leonora Sutton, Estate of Mayer Sutton, Isaac Sutton, Albert Sutton, Morris Sutton, Elias Sutton a/k/a Elliot Sutton and ABC Co., Inc. 1-10 allege as follows:

## THE PARTIES

1. Plaintiff Estate of Raymond Dayan is, and at all times mentioned in this Complaint was, an estate domiciled and existing in the State of New Jersey. Raymond Dayan ("Raymond") died November 20, 2016. Jonathan Dayan ("Jonathan") and Morris Dayan ("Morris D.") are Raymond's sons and were appointed to serve as the Co-Executors of Raymond's Estate by the Surrogate’s Office of Monmouth County, New Jersey in May, 2019 and continue to act in such capacity. Hereinafter Raymond and Raymond's Estate shall be referred to as "Raymond".

2. Plaintiff Merlene Dayan is, and at all times mentioned in this Complaint was, an individual domiciled and existing in the State of New Jersey and is the surviving spouse of Raymond Dayan.

3. Defendant Leonora Sutton ("Leonora") a/k/a Lenora Suttton a/k/a Nora Sutton is the Administrator of the Estate of Mayer Sutton ("Mayer"), who died on June 21, 2016. Leonora is the surviving spouse of Mayer. Leonora was appointed to serve as such Administrator by Decree of the Surrogate's Court of Kings County dated July 2, 2018 and continues to act in such capacity. At all times mentioned in this Complaint, Mayer's Estate is and was, an estate domiciled and existing in the State of New York.

4. At all relevant times, defendants Isaac Sutton ("Isaac") Albert Sutton ("Albert"), Morris Sutton ("Morris"), and Elias Sutton a/k/a Elliot Sutton ("Elliot") each reside in the Flatbush neighborhood of Brooklyn, New York and each is a member of the same Sephardic Jewish community as Merlene Dayan and the deceased Raymond Dayan.

5. At all relevant times until his death in 2016, Mayer did reside in the Flatbush neighborhood of Brooklyn, New York, and was a member of the same Sephardic Jewish community as plaintiff Merlene Dayan and the deceased Raymond Dayan. Those connections allowed the Suttons (i.e., Mayer, Isaac, Albert, Morris and Elliot) to gain the trust of the Dayans in order to obtain control over the plaintiffs' assets.

6. Upon information and belief, **third-party** Middlegate Securities Ltd. ("Middlegate") is a broker-dealer through which the Suttons managed investor assets in the United States, and, upon information and belief, founded. Middlegate is a New York corporation and Financial Industry Regulatory Authority (FINRA) registered broker-dealer with its principal place of business in New York, New York.

7. Between January 1992 and June 2010, Isaac Sutton's individual FINRA broker's license was registered at Middlegate.

8. Elliot Sutton's individual FINRA broker's license has been registered at Middlegate from 1989 until the present. He owns between 25% and 50% of the company.

9. Albert Sutton's individual FINRA broker's license has been registered at Middlegate from 1988 until the present. He is currently Executive VP, Secretary and Director of the company. He owns between 10% and 25% of the company.

10. At all times relevant to this action, Mayer was a banker engaged in the business of consulting about, managing and/or investing money owned by members of the same specific Sephardic Jewish community located in both Brooklyn, New York, and the Deal, New Jersey area including Merlene Dayan and Raymond, and maintained or held or on behalf of such community members in accounts located in the U.S. and in foreign countries.

11. At all times relevant to this action, upon information and belief, **separately from managing accounts in the United States through Middlegate**, Mayer, Isaac, Morris, Albert and Elliot, in a de facto general partnership constituting those 5 individuals, also engaged in the business of consulting about, managing and/or investing money owned by members of the same Sephardic Jewish community of Brooklyn, New York and the Deal, New Jersey area, in accounts located overseas such as **Switzerland and/or Israel**.

12. For example, in July, 2022, a jury in the trial of the matter entitled Estate of Leon Tawil v. Sutton, New York State Supreme Court, New York County, Index No. 653633/2015 found that Isaac breached an oral asset management agreement with Leon Tawil involving funds in Israel and issued a verdict awarding plaintiff in that matter more than $3 million.

13. Lawsuits alleging the improper management of investor assets overseas by some of the Suttons include Marcal Finance SA, et.al. v. Sutton, et.al., New York State Supreme Court, New York County, Index No. 653351/2015; Estate of Leon Tawil v. Sutton, New York State Supreme Court, New York County, Index No. 653633/2015; Dushey, et.al., v. Sutton, New York State Supreme Court, Kings County, Index No. 510252/2015; Hamway, et.al. v. Sutton, et.al., New York State Supreme Court, New York County, Index No. 653336/2015; Hamway, et.al. v. Sutton, et.al., New York State Supreme Court, Kings County, Index No. 522641/2018 and, upon information and belief, a lawsuit filed in Israel by Edmund Harari against Isaac alleging a loss of approximately $7 million.

14. Upon information and belief and as set forth in the Complaint in the matter entitled Hamway, et.al. v. Isaac Sutton, et.al., New York State Supreme Court, Kings County, Index No. 522641/2018, Isaac has testified in a lawsuit or an arbitration that he did not leave "the whole Middlegate family" until 2010.

15. Upon information and belief, at the trial in the matter Estate of Leon Tawil v. Sutton, New York State Supreme Court, New York County, Index No. 653633/2015, Isaac testified that he utilized a Middlegate email address for business purposes.

16. At all times relevant to this action, Isaac was a licensed stock broker and life insurance broker.

17. During the relevant time period, Mayer, Isaac, Elliot, Albert and Morris each held himself out as an investment advisor.

18. Upon information and belief, Isaac has significant experience with managing money and investments abroad, as a stockbroker and investment advisor.

19. Upon information and belief, Morris has significant experience with managing money and investments abroad, as an unregistered investment advisor.

20. Upon information and belief, Albert has significant experience with managing money and investments abroad, as a stockbroker and investment advisor.

21. Upon information and belief, Elliot has significant experience with managing money and investments abroad, as a stockbroker and investment advisor.

22. During his lifetime, Mayer was a banker and had significant experience with managing money and investments abroad as an investment advisor.

23. Upon information and belief, defendants and each of them were the agents, employees, general partners, joint-venturers, co-conspirators, owners, principals, shareholders, members, officers, directors and/or employers of the remaining defendants, and each of them and are and at all times herein mentioned were, acting within the course and scope of that agency, employment, general partnership, conspiracy, ownership, membership or joint venture, and that the acts and conduct herein alleged of each such defendant were known to, authorized by and/or ratified by the other defendants, and each of them.

<u>JURIDICTION AND VENUE</u>

24. Personal jurisdiction over the Defendants is based upon 28 U.S.C. § 1332(a)(1) because Plaintiffs are both citizens of New Jersey, and the Defendants are all citizens of the State of New York, and the matter in controversy exceeds the sum or value of $75,000.00, exclusive of costs and interests.

25. Venue is proper in the Southern District of New York pursuant to 28 US.C. §1391(b)(2) being that a substantial part of the events or omissions giving rise to the claims occurred in the Southern District of New York.

## ATLAS CAPITAL S.A. AS A RELEVANT THIRD PARTY

26. In 2006, third-party Atlas Capital S.A. was a Geneva, Switzerland based private wealth management firm founded in or around 1984 by the Dwek family. The Dweks and the Suttons are cousins.

27. In 2013, Atlas merged with Mirelis Holding SA (formerly called Mirelis InvesTrust SA), another Geneva, Switzerland based financial institution, which does business in the United States and Switzerland via Mirelis Advisors SA, a foreign registered investment adviser with the U.S. Securities and Exchange Commission (SEC) ("Mirelis").

28. Upon information and belief, the Dweks continue to own Mirelis and are involved in its operations. In 2014, Mirelis acquired Hyposwiss Private Bank Genève SA ("Hyposwiss").

29. Plaintiffs understand that both Hyposwiss and Mirelis (which are organized as a single enterprise, 100% owned by Mirelis Holding SA) carry on Atlas's pre-merger business activities. As used herein, "Atlas" shall refer to both the pre-merger Atlas and post-merger Mirelis and Hyposwiss companies.

## AS AND FOR A FIRST CAUSE OF ACTION AGAINST ESTATE OF MAYER SUTTON/LEONORA SUTTON AS EXECUTOR OF ESTATE OF MAYER SUTTON, ALBERT SUTTON, ISAAC SUTTON, MORRIS SUTTON AND ELLIOT SUTTON (Breach of Contract)

30. On approximately June 1, 2006, Raymond met with Mayer at the offices of Middlegate.

31. At said meeting, Raymond represented to Mayer that he was acting on behalf of himself and his wife (plaintiff Merlene Dayan).

32. At said meeting, Mayer represented to Raymond that he was acting on behalf of himself and his 4 sons (Isaac, Morris, Albert and Elliot) (altogether the 5 individuals are hereinafter

the "Suttons") who act together in an informal association (i.e., as partners in a de facto general partnership) to manage investor assets overseas.

33. At said meeting, Mayer, on behalf of the Suttons, orally offered to Mayer, in return for certain consideration described below, that the Suttons would manage in Atlas brokerage accounts in Switzerland controlled solely by the Suttons certain of the plaintiffs' marital assets such as stocks, bonds and cash.

34. Raymond, on behalf of himself and his wife (plaintiff Merlene Dayan), orally accepted such offer thereby creating an oral agreement.

35. Plaintiffs' son Morris Dayan was also present during the entire June 1, 2006 meeting.

36. Morris, Isaac, Albert and Elliot were also was present at various times during said meeting.

37. At said meeting, Mayer, on behalf of the Suttons, orally agreed that any investments utilizing plaintiffs' assets would be made and selected by the Suttons in their sole discretion and that such investments would be liquid or would be able to be liquidated within a reasonable time. At said meeting, Raymond, on behalf of the plaintiffs, orally accepted such provision of the oral agreement between plaintiffs and the Suttons.

38. At said meeting, Mayer, on behalf of the Suttons, orally agreed that plaintiffs' assets managed by the Suttons would be liquidated promptly whenever plaintiffs requested funds from the investments managed by the Suttons. At said meeting, Raymond, on behalf of the plaintiffs, orally accepted such provision of the oral agreement between plaintiffs and the Suttons.

39. At said meeting, Mayer, on behalf of the Suttons, orally agreed that plaintiffs' funds would be managed for plaintiffs' exclusive benefit and in their best interests and would include a balanced mix of conservative and more risky investments. At said meeting, Raymond, on behalf of

the plaintiffs, orally accepted such provision of the oral agreement between plaintiffs and the Suttons.

40. At said meeting, Mayer, on behalf of the Suttons, orally agreed that the objectives of the investments would be to preserve capital and provide income given that the Dayans were elderly retirees. At said meeting, Raymond, on behalf of the plaintiffs, orally accepted such provision of the oral agreement between plaintiffs and the Suttons. In 2006, Raymond was 80 years old and Merlene was 71 years old.

41. At said meeting, Mayer, on behalf of the Suttons, orally agreed that, in return for and in consideration of the Suttons' management of plaintiffs' assets, the Suttons were entitled to charge amounts set by Swiss tariffs for annual management, custodian, and administration fees on the total amount under management, for commissions on every investment trade, and for other fees typically associated with investment brokerage accounts such as margin interest. At said meeting, Raymond, on behalf of the plaintiffs, orally accepted such provision of the oral agreement between plaintiffs and the Suttons.

42. On or about June 7, 2006, Raymond provided the Suttons with certain personal information including his home address and copy of his U.S. Passport containing his date of birth and middle name for the purpose of opening brokerage accounts at Atlas in Switzerland to contain plaintiffs' assets for management by the Suttons.

43. On June 14, 2006, the Suttons filed the necessary French-language paperwork utilizing the personal information provided by Raymond to open 3 separate accounts at Atlas in Switzerland to contain plaintiffs' assets for management by the Suttons.

44. The paperwork filed by the Suttons on June 14, 2006 to open the Atlas accounts confirmed the provision of the June 1, 2006 oral agreement between the parties that the Suttons

through Atlas could charge the amounts set by tariffs in Switzerland for management, custodian, and administration fees, commissions and other brokerage fees as consideration for managing plaintiffs' funds.

45. The paperwork filed by defendants on June 14, 2006 to open the Atlas accounts confirmed the provision of the June 1, 2006 oral agreement between the parties that the Suttons through Atlas had sole discretion to manage plaintiffs' funds in the Atlas accounts.

46. On July 30, 2009, the Suttons provided Atlas with additional French-language additional paperwork relating to the plaintiffs' accounts specifying that plaintiffs' accounts would contain mixed (mixte) investments including conservative (conservateur), income-generating (equilibre) and risky (dynamique) assets. This paperwork confirmed the provision of the June 1, 2006 oral agreement between the parties that the plaintiffs' funds managed by the Suttons through Atlas would be invested in a balanced mix of conservative and more risky investments.

47. On July 6, 2006, upon opening of the Atlas accounts pursuant to the June 14, 2006 paperwork and pursuant to the Suttons' directions, Raymond transferred various securities such as stocks and bonds worth $1,328,523 already owned by the plaintiffs into 3 separate Atlas accounts in Switzerland to be managed and controlled by the Suttons.

48. On or about August 10, 2006, plaintiffs deposited an additional $180,000 in cash into one of the 3 Atlas accounts.

49. On or about November 1, 2006, plaintiffs deposited an additional $187,285 into the same Atlas account that the $180,000 was deposited into.

50. As a result of such transfers and deposits, the Suttons received securities and cash totaling approximately $1,695,908 owned by plaintiffs to manage.

51. Such funds were the sole assets of the Dayans besides their condo apartment in Long Branch, New Jersey and constituted their life savings.

52. From August 28, 2006 to August 20, 2012, plaintiffs periodically requested and received from the defendants 13 separate withdrawals of funds from the Atlas accounts totaling $605,105 in order to pay for some of the ongoing living expenses of the Dayans.

53. In approximately January, 2013 and continually until February, 2018, Raymond Dayan, plaintiff Merlene Dayan, and/or plaintiffs' agents (i.e., plaintiffs' sons Morris Dayan and/or Jonathan Dayan) requested either by text, over the telephone or face-to-face from Mayer, Morris, Issac, Albert and/or Elliot (in various permutations) (1) the full and orderly liquidation of all plaintiffs' investments managed by the Suttons and (2) the payment to plaintiffs of all funds resulting from such liquidation.

54. In response to the plaintiffs' continual requests for a full redemption of plaintiffs' assets, the Suttons never disputed that they owed plaintiffs money under the agreement between the plaintiffs and the Suttons.

55. For example, during a face-to-face meeting occurring at Middlegate's offices in October, 2014 between Morris Dayan and Jonathan Dayan (acting as agents on behalf of plaintiffs), on the one hand, and Albert and Elliot, on the other hand, Albert and Elliot did not dispute that the Suttons owed plaintiffs money pursuant to the agreement between plaintiffs and defendants.

56. As another example, during a face-to-face request occurring at the funeral of Steven Levy (Merlene's brother) in April, 2017, Joey Levy, Merlene's brother acting as agent for the plaintiffs, requested from Albert that defendants return plaintiffs' funds and Albert did not dispute that defendants owed plaintiffs money pursuant to the agreement between plaintiffs and the Suttons.

57. In response to these requests, defendants made 4 check repayments to plaintiffs of $100,000 on August 29, 2016, $50,000 on March 29, 2017 and $50,000 on August 2, 2017, and $120,000 on September 22, 2017. Each payment came from a bank account in the name of "Lenora Sutton" a/k/a defendant Leonora Sutton, after Mayer died in June, 2016 but **before** Ms. Sutton was appointed administrator of the estate of Mayer Sutton in 2018.

58. As mentioned above, plaintiff Raymond Dayan died in November, 2016, after 1 of the 4 check repayments occurred.

59. After deduction of such repayments, plaintiffs have calculated that at least $749,308.93 of the initial principal investment was still due to be returned to plaintiffs by defendants as of August 2, 2017, the date of the last check repayment. This amount constitutes only the amount actually invested with the defendants and does not include any gain that should have resulted from a mixed investment strategy implemented from 2006 to 2017 applicable to typical retirement savings. For example, from August 1, 2006 to August 1, 2017, the Dow Jones Industrial Index went from 11,391 to 21,950, an increase of approximately 92.7 % or approximately 8.42% per year.

60. After plaintiffs' son and agent (Morris Dayan) made a text request in December, 2017 for a status of the repayments due by defendants, defendant Morris Sutton responded by text in February, 2018 that no additional funds were available for repayment. Morris Sutton did not explain in that text or anytime afterwards what had happened to the remainder of the plaintiffs' assets managed by the Suttons.

61. In breach of the agreement, defendants have refused to return any more money to the plaintiffs.

62. In breach of the agreement including, without limitation, the provision requiring plaintiff's assets to be invested in a mixed asset portfolio, defendants have refused to inform plaintiffs as to what happened to remainder of plaintiffs' assets managed by the Suttons.

63. Defendants have refused to communicate with or meet with plaintiffs or their representatives despite multiple requests for information by plaintiffs.

64. In breach of the agreement including, without limitation, the provision requiring plaintiff's assets to be invested in a mixed asset portfolio, defendants have refused to provide any account statements concerning plaintiff's money.

65. Throughout the time that the Suttons were investing plaintiffs' assets, the Suttons never provided any information, account statements or trade confirmations to plaintiffs concerning the investments made with plaintiffs' assets.

66. As a result of such obstreperous conduct, plaintiffs have had to hire investigators to conduct a costly financial investigation to ascertain any and all information regarding the assets that were entrusted to the Suttons.

67. Because the Suttons have never provided any account statements to plaintiffs, plaintiffs never had any knowledge as to the uses of plaintiffs' assets by the Suttons until the investigators obtained some partial account statements from Atlas in 2019.

68. A review of account statements discovered and provided to plaintiffs by Atlas in approximately March, 2019 after plaintiffs' investigators requested that Atlas provide such information directly to plaintiffs indicates that (1) one account containing approximately $617,246 of plaintiffs' money was closed in 2013 and that the $617,246 that was in the account was withdrawn on February 21, 2013, (2) a withdrawal of $150,026 previously occurred on November 11, 2010 from that account, (3) another account containing $261,380 USD (200,000 EURO) of

plaintiffs' money was closed in 2014 and the $261,380 that was in the account was withdrawn on January 4, 2013. The Atlas account statements in plaintiffs' possession do not disclose where those withdrawals went. The withdrawals did not go to plaintiffs.

69. The Suttons also made the following illegal transfers out of the Altas accounts without justification or authorization: (i) $579.79 on January 26, 2010, (ii) $322.80 on July 10, 2009, (iii) $7,425.00 on October 15, 2009, (iv) $900.00 on January 11, 2011, (v) $746.37 on February 22, 2013, (vi) $7,560.96 on February 21, 2013, and (vii) $176.64 on December 18, 2009. The Atlas account statements in plaintiffs' possession do not disclose where those transfers went. The transfers did not go to plaintiffs.

70. In addition, defendants have retained 75 shares in Thema International Fund worth $22,945.37 upon purchase in 2006 and which were redeemed in full in settlement with the Madoff fraud trustee in 2017.

71. Upon information and belief, some of such missing money above totaling $1,069,308.93 was transferred by the Suttons to finance the construction of a $145 million wind farm by Isaac in the Golan Heights in Israel. A representative of Edmund Harari who has sued Isaac in Israel has informed plaintiffs that he believes this is where some of the money illegally taken from Mr. Harari, plaintiffs herein and the plaintiffs in the lawsuits listed above in paragraph 13 went. The wind farm is also mentioned in testimony given by Isaac that is alleged in paragraph 47 of the Complaint in Hamway, et.al. v. Sutton, et.al., New York State Supreme Court, Kings County, Index No. 522641/2018.

72. Upon information and belief, some of the missing money was taken by defendant Leonora Sutton because the 4 check repayments in 2016 and 2017 came from her bank account after the respective Atlas accounts mentioned above were closed in 2013.

73. Upon information and belief, some of the missing money was taken by Morris because Morris texted plaintiffs' son in February, 2018 that no additional funds were available for repayment because “I’m literally borrowing money from my friends to pay my bills until my apt (sic) is sold.”

74. Deducting the 4 repayments totaling $320,000 in 2016 and 2017 from the $1,069,308.93 of missing money leaves at least $749,308.93 of plaintiffs' money that is owed to plaintiffs by defendants.

75. A review of account statements discovered and provided to plaintiffs by Atlas in approximately March, 2019 after plaintiffs' investigators requested that Atlas provide such information directly to plaintiffs indicates that the Suttons, through Atlas, charged plaintiffs and received a total of (1) $2,757.97 in margin interest from 2008 to 2010, (2) $116,355.47 in management, custodian, and administration fees from 2006 to 2012, and approximately (3) $42,000 in trading commissions from 2006 to 2014.

76. In breach of the agreement, plaintiffs’ funds have not been managed for plaintiff’s exclusive benefit. Instead, the Suttons have allowed the plaintiffs to be deprived of their assets.

77. In breach of the agreement, plaintiff's assets were not invested in a mixed asset portfolio.

78. In breach of the agreement, plaintiffs' investments were not liquid assets or assets that could be liquidated within a reasonable time and instead were lost by the Suttons.

79. Prior to the filing of this lawsuit, the Suttons have not denied any wrongdoing or involvement in the loss of plaintiffs’ funds.

80. Defendants including the Suttons have also obstructed plaintiffs' investigation of what occurred by refusing to provide any information concerning the plaintiffs’ funds, including,

without limitation, information regarding any and all transactions and investments wrongfully funded with plaintiffs' money and without the plaintiffs' knowledge or consent.

81. Defendants including the Suttons have never denied having control of or managing plaintiffs' assets. Rather, defendants have declared that repayment to plaintiffs was ceasing as of February 23, 2018 only because, as Morris Sutton wrote in a text to plaintiffs' son (Morris Dayan) on February 23, 2018, "I'm literally borrowing money from my friends to pay my bills until my apt (sic) is sold."

82. Upon information and belief, defendant Morris Sutton sold his apartment referred to in his February 23, 2018 text for $3,395,000 on May 23, 2019. Plaintiffs never received any money from the proceeds of defendant Morris Sutton's apartment sale.

83. The Suttons have breached the agreement with plaintiffs by (1) allowing plaintiffs' funds to be lost or used for the benefit of others instead of plaintiffs' benefit, (2) failing to return all of plaintiffs' assets to the plaintiffs in the United States from the Atlas accounts controlled by the Suttons after plaintiffs requested the return of their assets, and (3) failing to exercise proper oversight in the plaintiffs' best interests over the Atlas accounts holding plaintiffs' funds.

84. Defendants' breach of the agreement with plaintiffs directly caused plaintiff to suffer losses in an amount that is no event less than $749,308.93, subject to full accounting and trial, plus consequential damages arising from such breaches, attorneys' fee, investigation fees, a reasonable rate of return on plaintiffs' invested funds from the date of investment, and prejudgment interest.

AS AND FOR A SECOND CAUSE OF ACTION ESTATE OF MAYER SUTTON/LEONORA SUTTON AS EXECUTOR OF ESTATE OF MAYER SUTTON, ALBERT SUTTON, ISAAC SUTTON, MORRIS SUTTON AND ELLIOT SUTTON
(Breach of Fiduciary Duty)

85. Plaintiffs reallege and repeat each and every allegation set forth above as if fully set forth again herein.

86. The Suttons were the financial advisors of plaintiffs Merlene Dayan and Raymond Dayan with discretionary authority over the plaintiffs' assets subject to the requirement that the assets be invested in investments that could be liquidated within a reasonable time and so that plaintiffs' assets could be returned to the plaintiffs in the United States from the Atlas accounts promptly.

87. The paperwork submitted by the Suttons to Atlas to open the Atlas accounts on June 14, 2006 sets forth the conditions, terms and obligations of the Suttons in managing the Atlas accounts including their fiduciary duty to manage the accounts in their sole discretion.

88. The June 14, 2006 paperwork includes the following language translated from French to English:

"ATLAS may carry out, in its name but for the account and at the exclusive risk of the customer, **all acts that it deems appropriate or useful to the management of the client's assets**. ATLAS may in particular invest the assets of the customer, at its free discretion, in all instruments of investments, such as fixed term deposits, fiduciary investments, tar metals, commodities, investments in money market and capital market securities (e.g. stocks, bonds, notes) and derivatives (e.g. options, interest rate instruments, equity instruments) as well as financial future. ATLAS can carry out spot and forward transactions. ATLAS may give any Instructions to buy, subscribe, sell, convert, exchange, lend, arbitrate any securities and other investments such as currencies and precious metals and take any other action (including futures and hedging) which it deems appropriate in the interest of the client for the administration of his/their assets.
The customer authorizes ATLAS to invest its/their assets in Swiss and foreign collective management products, such as shares or investment fund units, investment funds with or without

redemption, of trusts, regardless of their legal structure, and instead of their activity (hereinafter collectively "the Management Products"), which may make investments in any instrument mentioned in previous paragraph."

89. In reliance upon the Suttons' superior financial knowledge, plaintiffs Merlene Dayan and Raymond Dayan entrusted management of all their liquid assets and life savings to the Suttons.

90. The Suttons therefore owed fiduciary duties of good faith and loyalty to plaintiffs Merlene Dayan and Raymond Dayan.

91. The Suttons illegally and improperly allowed plaintiffs' assets to be transferred to unknown parties, Isaac, Morris and/or Leonora Sutton, and/or to parties controlled by, owned by or reporting to Isaac, Morris and/or Leonora Sutton.

92. The Suttons breached their duties by failing to act in plaintiffs' interests, and instead allowed others to use of plaintiffs' assets to the detriment of plaintiffs.

93. The Suttons further breached their duties to plaintiffs by failing to provide plaintiffs with complete information concerning accounts containing investments made with plaintiffs' assets and the uses of plaintiffs' funds.

94. The Suttons' breaches of fiduciary duties caused the plaintiffs to be deprived of their assets and main source of their living expenses.

95. Such breaches of fiduciary duties directly caused plaintiff to suffer losses in an amount that is in no event less than $749,308.93, subject to full accounting and trial, plus consequential damages arising from such breaches, attorneys' fee, investigation fees, a reasonable rate of return on plaintiffs' invested funds from the date of investment, prejudgment interest and punitive damages.

AS AND FOR A THIRD CAUSE OF ACTION AGAINST LEONORA SUTTON, ISAAC SUTTON, MORRIS SUTTON, ALBERT SUTTON, ELLIOT SUTTON AND THE ESTATE OF MAYER SUTTON
(Unjust Enrichment)

96. Plaintiffs reallege and repeat each and every allegation set forth above as if fully set forth again herein. In the event that the Court or other fact finder determines that there was no agreement between plaintiffs and the Suttons, then plaintiffs plead this cause of action in the alternative to the first cause of action for breach of agreement.

97. Plaintiffs were induced by the Suttons to entrust plaintiffs' assets to them.

98. Upon information and belief and as mentioned above, Isaac illegally caused plaintiffs' funds to be transferred from the Atlas accounts to finance the construction of a wind farm in Israel that he manages for his benefit.

99. Upon information and belief and as mentioned above, some of the missing money was taken by defendant Leonora Sutton because the 4 check repayments in 2016 and 2017 came from her bank account after the respective Atlas accounts mentioned above were closed in 2013.

100. Upon information and belief, some of the missing money was taken by Morris because Morris texted plaintiffs' son in February, 2018 that no additional funds were available for repayment because "I'm literally borrowing money from my friends to pay my bills until my apt (sic) is sold."

101. Rather than manage the plaintiffs' assets in plaintiffs' best interests and for plaintiffs' exclusive benefit, the Suttons lost plaintiffs' assets and thus improperly charged management, administrative, and custodial fees, commissions and other fees totaling approximately $161,000.

102. Accordingly, certain defendants were unjustly enriched at the expense of plaintiffs in different amounts.

103. Defendants breached their duties in making use of the plaintiffs' assets in a manner contrary to plaintiffs' interests or in losing plaintiffs' assets.

104. Under such circumstances, it is against equity and good conscience to permit each defendant to retain the respective benefit he or she received as a result of his or her wrongful conduct, and plaintiffs are entitled to recoup the specific benefit received by each defendant totaling at least $749,308.93 plus approximately $161,000 in trading expenses as a result of their respective wrongdoings, in an amount to be proven at trial, subject to full accounting, plus attorneys' fees, investigation fees, and prejudgment interest.

AS AND FOR A FOURTH CAUSE OF ACTION AGAINST LEONORA SUTTON, ISAAC SUTTON, AND/OR MORRIS SUTTON
(Money Had and Received)

105. Plaintiffs reallege and repeat each and every allegation set forth above as if fully set forth again herein.

106. The assets given by plaintiffs to the Suttons to manage belonged to plaintiffs.

107. As set forth above Isaac, Leonora Sutton and/or Morris either directly or indirectly received money from the Atlas accounts that the Suttons created to manage plaintiffs' assets.

108. Plaintiffs never authorized said defendants to receive that money.

109. Said defendants as recipients of plaintiffs' money benefitted from the use and possession of that money.

110. Said defendants should not in equity and good conscience be permitted to retain plaintiffs' money that was wrongfully transferred, used on the behalf of said defendants, and/or paid to said defendants.

111. Isaac Sutton, Leonora Sutton and/or Morris Sutton should therefore be disgorged of all money belonging to plaintiffs that was respectively had or received by each of them totaling

$749,308.93, subject to full accounting and trial, plus attorneys' fee, investigation fees, and prejudgment interest.

AS AND FOR A FIFTH CAUSE OF ACTION AGAINST LEONORA SUTTON, ISAAC SUTTON, AND/OR MORRIS SUTTON
(Conversion)

112. Plaintiffs reallege and repeat each and every allegation set forth above as if fully set forth again herein.

113. Plaintiffs had a right to possession of the assets within the accounts utilized by the Suttons to manage plaintiffs' funds.

114. Defendants Isaac, Leonora Sutton and/or Morris took possession of the Atlas accounts' assets for their own use and enjoyment.

115. Said defendants' respective use of the funds therein excluded the plaintiffs from making use of the funds or benefitting from them.

116. Said defendants' conversion of the accounts and the funds therein for their own benefit to the exclusion of plaintiffs damaged the plaintiffs in an amount in an amount totaling $749,308.93, subject to full accounting and trial, plus consequential damages arising from such conversion, attorneys' fee, investigation fees, prejudgment interest and punitive damages.

AS AND FOR A SIXTH CAUSE OF ACTION AGAINST ALL DEFENDANTS
(Accounting)

117. Plaintiffs reallege and repeat each and every allegation set forth above as if fully set forth again herein.

118. In approximately January, 2013 and continually until February, 2018, Raymond Dayan, plaintiff Merlene Dayan, and/or plaintiffs' agents (i.e., plaintiffs' sons Morris Dayan and/or Jonathan Dayan) requested either over the telephone or face-to-face from Mayer, Morris, Issac,

Albert and/or Elliot (in various permutations) an accounting of the plaintiffs' investments managed by the Suttons.

119. The Suttons controlled plaintiffs' assets since July, 2006.

120. The Suttons owed plaintiffs fiduciary duties with respect to plaintiffs' assets.

121. Plaintiffs relied upon the Suttons to manage and oversee the plaintiffs' assets and life savings.

122. The Suttons have failed to account fully for the uses of the plaintiffs' assets.

123. Defendants should therefore be required to account to plaintiffs for all of the plaintiffs' assets under their control.

JURY DEMAND

124. Plaintiffs demand a trial by jury on all issues.

WHEREFORE, judgment is demanded in favor of Plaintiffs as follows:

On the first claim for breach of agreement against Defendants in an amount to be proven at trial including compensatory damages that are at least $749,308.93, consequential damages, investigation fees, a reasonable rate of return on plaintiffs' invested funds from the date of investment, pre- and post-judgment interest, attorneys' fees, costs and other relief as this Court may deem appropriate.

On the second claim for breach of fiduciary duty against Defendants in an amount to be proven at trial including compensatory damages that are at least $749,308.93, consequential damages, investigation fees, a reasonable rate of return on plaintiffs' invested funds from the date of investment, pre- and post-judgment interest, punitive damages, attorneys' fees, costs and other relief as this Court may deem appropriate.

On the third claim for unjust enrichment against each defendant in separate amounts to be proven at trial with respect to each defendant and disgorging the respective benefit received by each defendant as a result of his or her wrongful conduct totaling at least $749,308.93 plus approximately $161,000 in trading expenses as a result of their wrongdoing, subject to full accounting, plus attorneys' fees, investigation fees, and prejudgment interest.

On the fourth claim for money had and received against Isaac Sutton, Leonora Sutton and/or Morris Sutton in separate amounts to be proven at trial with respect to each said defendant and disgorging all money belonging to plaintiffs that was had or received by each of them totaling $749,308.93, subject to full accounting, plus attorneys' fee, investigation fees, and prejudgment interest.

On the fifth claim for conversion against Isaac Sutton, Leonora Sutton and/or Morris Sutton in separate amounts to be proven at trial with respect to each said defendant for the amount converted by each said defendant totaling $749,308.93, subject to full accounting, plus consequential damages arising from such conversion, attorneys' fee, investigation fees, prejudgment interest and punitive damages.

On the sixth claim for an accounting against Defendants in an amount to be determined at trial including compensatory damages that are at least $749,308.93, consequential damages, investigation fees, a reasonable rate of return on plaintiffs' invested funds from the date of investment, pre- and post-judgment interest, attorneys' fees, costs and other relief as this Court may deem appropriate.

Dated: July 15, 2022
New York, NY

By:________/s/_Gabriel Fischbarg________

Gabriel Fischbarg, Esq.
230 Park Avenue, Suite 908
New York, New York 10169
(917) 514-6261
Attorney for plaintiffs